UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| LISA W.,[1] | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) No. 1:20-cv-02829-MG-SEB |
| | ) |
| KILOLO KIJAKAZI, Acting Commissioner of the Social Security Administration, | ) ) ) |
| | ) |
| *Defendant.* | ) |

**ENTRY REVIEWING THE COMMISSIONER'S DECISION**

In December 2016, Plaintiff Lisa W. filed for disability insurance benefits ("DIB") from the Social Security Administration ("SSA"), alleging a disability onset date of February 15, 2010. [Filing No. 12-5 at 4.] Her application was initially denied on May 19, 2017, [Filing No. 12-4 at 7-15], and upon reconsideration on September 12, 2017, [Filing No. 12-4 at 17-25]. Lisa W. requested a hearing, and Administrative Law Judge Gladys Whitfield (the "ALJ") conducted hearings on both June 27, 2019 and November 15, 2019. [Filing No. 12-2 at 40-145.] The ALJ issued a decision on December 2, 2019, concluding that Lisa W. was not entitled to receive benefits. [Filing No. 12-2 at 21-32.] The Appeals Council denied review on August 31, 2020. [Filing No. 12-2 at 2-6.]

---

[1] To protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

On October 31, 2020, Lisa W. filed this civil action asking the Court to review the denial of benefits according to 42 U.S.C. § 405(g). [Filing No. 1.] The parties consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. [Filing No. 11.]

## I.
### STANDARD OF REVIEW

"The [SSA] provides benefits to individuals who cannot obtain work because of a physical or mental disability." Biestek v. Berryhill, __U.S.__, 139 S. Ct. 1148, 1151 (2019). Disability is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." Stephens v. Berryhill, 888 F.3d 323, 327 (7th Cir. 2018) (citing 42 U.S.C. § 423(d)(1)(A)).

When an applicant appeals an adverse benefits decision, the Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. Id. For purposes of judicial review, "substantial evidence" is such relevant "evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" Zoch v. Saul, 981 F.3d 597, 601 (7th Cir. 2020) (quoting Biestek, 139 S. Ct. at 1154). "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." Stephens, 888 F.3d at 327. Reviewing courts also "do not decide questions of credibility, deferring instead to the ALJ's conclusions unless 'patently wrong.'" Zoch, 981 F.3d at 601 (quoting Summers v. Berryhill, 864 F.3d 523, 528 (7th Cir. 2017)). The Court does "determine whether the ALJ built an 'accurate and logical bridge' between the evidence and the conclusion." Peeters v. Saul, 975 F.3d 639, 641 (7th Cir. 2020) (quoting Beardsley v. Colvin, 758 F.3d 834, 837 (7th Cir. 2014)).

The SSA applies a five-step evaluation to determine whether the claimant is disabled. *Stephens*, 888 F.3d at 327 (citing 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)). The ALJ must evaluate the following, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000), *as amended* (Dec. 13, 2000) (citations omitted). "If a claimant satisfies steps one, two, and three, she will automatically be found disabled. If a claimant satisfies steps one and two, but not three, then she must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

After step three, but before step four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id.* The ALJ uses the RFC at step four to determine whether the claimant can perform her own past relevant work and if not, at step five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 404.1520(a)(4)(iv)-(v). The burden of proof is on the claimant for steps one through four; only at step five does the burden shift to the Commissioner. *See Clifford*, 227 F.3d at 868.

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. *Stephens*, 888 F.3d at 327. When an ALJ's decision does not apply the correct legal standard, a remand for further proceedings is usually the appropriate remedy. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021). Typically, a remand is also

appropriate when the decision is not supported by substantial evidence. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). "An award of benefits is appropriate only where all factual issues have been resolved and the 'record can yield but one supportable conclusion.'" *Id.* (quoting *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993)).

## II.
### BACKGROUND

Lisa W. was 33 years old on February 15, 2010, the date of her alleged onset of disability, and was 40 years old at the time of her December 2016 application. [Filing No. 12-2 at 30.] Lisa W.'s date last insured is December 31, 2018. [Filing No. 12-2 at 23.] To qualify for DIB, she must show that she was disabled as of December 31, 2018. *See Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011).

Lisa W. completed a high school education, and she has a master's degree in social work. [Filing No. 12-2 at 109.] She has past relevant work experience as a customer service clerk, computer operator, online merchandiser, child care provider, animal caretaker, survey worker, and research assistant. [Filing No. 12-2 at 30.] For the ten years immediately preceding her alleged onset date, Lisa W. worked in Washington, D.C. as a research associate. [Filing No. 12-2 at 106.] After that, she moved to Indiana to live with her parents and worked a variety of jobs, including babysitting, dog sitting, and administering a survey for a non-profit organization. [Filing No. 12-2 at 106-108.] Starting in February 2019, she began performing customer service work for Goodwill and remained in that position through her hearing dates. [Filing No. 12-2 at 23.] Lisa W.'s original application alleges that she is unable to work because she suffers from migraines, major depressive disorder, neck pain, back pain, sleep apnea, temporomandibular joint dysfunction

with headaches, flat feet (which cause back pain), high blood pressure, rosacea, pre-diabetes, obesity, and adenomyosis. [Filing No. 12-6 at 5.][2]

The ALJ followed the five-step sequential evaluation set forth in 20 C.F.R. § 404.1520(a)(4) and concluded that Lisa W. was not disabled and therefore did not qualify for benefits. [Filing No. 12-2 at 32.] Specifically, the ALJ found as follows:

- At Step One, Lisa W. had not engaged in substantial gainful activity[3] during the period at issue (at least for purposes of the decision). [Filing No. 12-2 at 23 ("The undersigned finds the claimant is currently employed at Goodwill and earning above SGA. However, the undersigned finds that since the claimant can be denied at a later step, the undersigned will continue with the sequential evaluation.").]

- At Step Two, Lisa W. had the following severe impairments: "Cervical spine disorder, obesity, and major depressive disorder." [Filing No. 12-2 at 24.]

- At Step Three, Lisa W. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. [Filing No. 12-2 at 24.]

- After Step Three but before Step Four, Lisa W. had the RFC "to perform light work as defined in 20 CFR 404.1567(b) except: The claimant can occasionally climb ramps and stairs as well as occasionally balance and stoop, but never climb ladders, ropes, or scaffolds and never kneel, crouch, or crawl. She can frequently push and pull as well as reach sideways and forward, but occasionally overhead reach. She can continuously handle, finger, or feel. She must avoid all exposure to unprotected heights, hazardous moving machinery, and avoid any rapid head or neck movements. She can have at least occasional, superficial interaction with coworkers, supervisors, and general public. She can do simple and more complex work. She must avoid all strobe lights or flashing lights in ordinary course of business. She cannot perform any job where driving is required to perform functions of the job. She cannot work in any job exceeding level three, moderate noise level. She cannot do fast-paced production requirements." [Filing No. 12-2 at 26.]

---

[2] The relevant evidence of record is amply set forth in the parties' briefs and need not be repeated here. Specific facts relevant to the Court's disposition of this case are discussed below.

[3] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572.

- At Step Four, the ALJ found that Lisa W. is unable to perform her past relevant work.  [Filing No. 12-2 at 30.]

- At Step Five, relying on the testimony of a vocational expert ("VE") and considering Lisa W's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she could perform, such as sorter, inspector, packing, inspector, and assembler.  [Filing No. 12-2 at 31.]

## III.
### DISCUSSION

Lisa W. argues that the ALJ erred: (1) by not adequately addressing absences and time off task in the RFC determination; (2) by failing to consider whether her migraine headaches met or equaled Listing 11.02; and (3) by failing to create an accurate and logical bridge between the evidence and the findings.

### A.  Migraine Headaches and the RFC Finding

Lisa W. argues that the ALJ failed to consider the number of absences and time off work necessary to address Lisa W.'s recurring migraines in the RFC finding.  [Filing No. 15 at 22.]  She notes that she left her research associate job in 2010 because of excessive absences and that despite medical treatment, she still suffers from frequent migraine headaches.  [Filing No. 15 at 22-23.]  She says the ALJ did not consider the frequency of her migraine headaches in determining her RFC.  [Filing No. 15 at 25.]  This omission, Lisa W. says, is due in part to the ALJ's determination at Step Two that her migraines are a non-severe, rather than severe, impairment.  [Filing No. 15 at 25.]

The Commissioner responds that the ALJ was entitled to rely on the testimony of Dr. Lee Fischer, M.D., an impartial medical expert ("IME") who found that Lisa W.'s migraines were not severe and did not pose any functional limitations (including time off task and absences).  [Filing No. 17 at 6.]  The reliance on Dr. Fischer's opinion, the Commissioner argues, is especially appropriate in this case which "involved a lengthy medical record with mental and physical record"

6

and that it was "prudent" for the ALJ to arrange for two IMEs to testify at the hearings. [Filing No. 17 at 6.]

In reply, Lisa W. argues that Dr. Fischer's opinion is flawed and belies other medical evidence concerning her migraine headaches, including opinions from her treating physicians. [Filing No. 20 at 1-3.]

Because Lisa W.'s arguments focus on the ALJ's analysis (or alleged lack thereof) of limitations posed by her migraine headaches, the Court begins with a summary of the evidence on that front. Lisa W. reported first experiencing migraine headaches in the fall of 1999. [Filing No. 12-6 at 67.] They became worse, and Lisa W. testified that she was asked to resign from her research associate position in 2010 because of absences, which were due in part to her migraine headaches. [Filing No. 12-2 at 102.] In September 2010, Lisa W. presented for a neurological consultation with neurologist Dr. James Fesenmeier, M.D. [Filing No. 12-7 at 59-60.] Dr. Fesenmeier noted that Lisa W. was reporting a long history of headaches and that she was experiencing daily headaches that she "describes as an aching pain, but then about 4 times a month, she will have a more severe throbbing or stabbing pain." [Filing No. 12-7 at 59.]

In June 2011, she reported having about two headaches per week. [Filing No. 12-8 at 2.] Lisa W.'s neurologist, Dr. Kristi George, M.D., diagnosed her with "common migraine headaches" and "vertigo associated with migraines" in the summer of 2011. [*See, e.g.*, Filing No. 12-12 at 247.] In August 2011, Lisa W. reported having two to three headaches each week. [Filing No. 12-12 at 251.] In February 2012, Lisa W. saw Dr. George and reported that "[s]he had a really bad month last month, probably the worst month she had ever had as far as headaches" and that she was experiencing these headaches about eight days each month. [Filing No. 12-12 at 258-59.] In April 2012, Lisa W. told Dr. George that she was feeling better but still had headaches "3 times

a week, 2 out of 3 she is able to get to go away with some relaxation techniques and pressure points. Once every 10-14 days she has to take a Vicodin." [Filing No. 12-12 at 261.]

In March 2013, Lisa reported to Dr. George that she was experiencing "more headaches, pretty much daily again." [Filing No. 12-12 at 255.] In January 2014, Lisa W. reported that "she still has headaches, major one about once a week." [Filing No. 12-12 at 264.] In February 2015, Dr. George noted that Lisa W. reported having migraine attacks between one and three times a week, and Dr. George recommended that Lisa W. receive Botox injections to treat her migraines. [Filing No. 12-12 at 268.] In April 2015, Lisa W. reported to Dr. George that she had experienced a headache "every single day this month" and that "[m]any of them are severe with throbbing, photophobia and nausea." [Filing No. 12-12 at 279.] Lisa W. began receiving Botox treatments in May 2015 to treat her migraines. [*See* Filing No. 12-12 at 283.] Follow up notes from November 2015, indicated that "Lisa is definitely having benefit from the [B]otox, she is only having about two migraines a week." [Filing No. 12-12 at 289.] Lisa W. continued receiving Botox treatments during 2016 and into 2017. [*See, e.g.*, Filing No. 12-12 at 296-98.]

As part of her application for DIB, Lisa W. reported in March 2017 that she has 15 migraine headaches per month. [Filing No. 12-6 at 67.] At that time, she received Botox injections and took prescription medications to treat her migraines. [Filing No. 12-6 at 67.] When she experiences a migraine, she says she needs to lie down and place an ice pack on her head and stay there until the migraine goes away. [Filing No. 12-6 at 67.] As part of her DIB application, the reviewing state agency found Lisa W.'s migraines were a severe impairment but did not meet or medically equal a listing. [Filing No. 12-3 at 7; Filing No. 12-3 at 22.]

In December 2017, Dr. George completed a "Work Restriction/Physical Demand Form" in connection with Lisa W. seeking assistance through the State of Indiana's vocational rehabilitation

services.  [Filing No. 12-17 at 215-17.]  Dr. George indicated that Lisa W.'s ability to work a full eight-hour workday "depend[ed] on migraine episodes," indicating that she could work "no hours with episodes" and "up to 2 h[ou]rs without episodes."  [Filing No. 12-17 at 216.]  In response to questions about Lisa W.'s ability to carry things and complete repetitive motions, Dr. George qualified her answers by stating that Lisa W. could perform such tasks only if she was not having migraine episodes.  [Filing No. 12-17 at 216.]  Dr. George provided the following additional comment:  "Patient suffers from a long history of chronic intractable migraines that occur more than twice a week lasting duration is flexible due to unknown exact [sic] could be 24 [hours] – 72 [hours] this causes her to become sensitive to lights, sounds, smells[;] causes nausea, vomiting, vertigo."  [Filing No. 12-17 at 217.]  The vocational rehabilitation services agency found that Lisa W. "is unable to maintain focus for long periods of time due to her migraines."  [Filing No. 12-17 at 225.]

Lisa W. testified at her hearing before the ALJ that she has missed work because of her migraines.  [Filing No. 12-2 at 121.]  She further testified that some therapies, such as Botox and Invisalign treatments, have improved the length and severity of her migraines, but that she no longer receives Botox treatments because her health insurer required her to have 15 headaches per month to cover the treatments and the prior Botox treatments had reduced her headaches per month to less than 15.  [Filing No. 12-2 at 121-22.]  In response to questioning from the ALJ, she explained that even though she is still having two migraine headaches per week, she can work at her customer service job with Goodwill because the migraines are less intense and shorter in duration than those she previously experienced.  [Filing No. 12-2 at 122-23.]  She testified that now her migraines typically last "no more than a couple hours" but during the period for which she is claiming DIB, they lasted "[u]p to two days."  [Filing No. 12-2 at 122.]

9

The IME, Dr. Fischer, testified that Lisa W.'s migraine headaches were not a severe impairment. [Filing No. 12-2 at 57.] He cited Lisa W.'s report to her physician in June 2011 that she had experienced migraines for 10 to 12 years before that, *i.e.*, years before her alleged onset date, and thus "she's had essentially the same condition and certainly there's no evidence that it worsened over the last 15 years and after her onset date in 2010, if anything it probably appears that she got better once she was getting some Botox." [Filing No. 12-2 at 58-59.] Dr. Fischer also cited a notation in a June 2011 consult by Dr. George, in which Dr. George states that Lisa W. "has had MRIs, electronystagmograms, extensive testing in the past. I do have some of these records and it looks like things have been normal." [Filing No. 12-12 at 303.] Dr. Fischer testified that because he found Lisa W.'s migraine headaches to be non-severe, "that almost implies there are no functional limitations." [Filing No. 12-2 at 67.] When asked whether migraine headaches would cause increased absences from work, Dr. Fisher testified that they would, "[i]f they have a migraine during the workday, but there's no law that says they can't have a migraine on a weekend when they're not working anyway and, therefore, they wouldn't miss any work." [Filing No. 12-2 at 68.]

The VE testified that being off task 15% or more of the work day would preclude competitive employment. [Filing No. 12-2 at 139.] The VE also opined that being absent from work two or more days per month would preclude competitive employment. [Filing No. 12-2 at 139.]

The ALJ's RFC finding did not include a limitation posed by absences or time off task. [Filing No. 12-2 at 26.] In assessing Lisa W.'s migraines, the ALJ found that Lisa W.'s migraines constituted a non-severe impairment, finding that Lisa W. "has not alleged, and the record does not support, that migraines … ha[ve] caused more than minimal work-related difficulties." [Filing

No. 12-2 at 24.] Moving to the RFC assessment, the ALJ found that Lisa W.'s statements about the limiting effects of her migraines were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." [Filing No. 12-2 at 27.] The ALJ found Dr. Fischer's testimony to be highly persuasive. [Filing No. 12-2 at 29.] The ALJ found that Dr. George's assessment for the vocational rehabilitation program to be "less persuasive," but the ALJ incorrectly attributed Dr. George's opinion as being authored by Kyle Adcock, a vocational rehabilitation agency worker (to whom the opinion was addressed), rather than Lisa W.'s treating neurologist, Dr. George. [Filing No. 12-2 at 30.] The ALJ said the opinion was less than persuasive because "Mr. Adcock did not personally examine the claimant, but rather assessed her based on the claimant's subjective complaints rather than the medical evidence of record." [Filing No. 12-2 at 30.]

      An RFC represents "the maximum a person can do—despite his limitations—on a regular and continuing basis, which means roughly eight hours a day for five days a week." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (internal quotation marks omitted). In determining an individual's RFC, "the ALJ *must* evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano*, 556 F.3d at 563 (emphasis added). An ALJ must provide more than a "cursory analysis" for rejecting limitations alleged by a claimant. *Id.* That is so because the ALJ must build an "accurate and logical bridge" between the evidence and the result. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).

      Here, the ALJ failed to sufficiently address and confront evidence of Lisa W.'s migraine headaches in formulating the RFC. The first and most glaring issue is that the ALJ incorrectly attributed a report from Lisa W.'s treating neurologist (Dr. George) to a vocational rehabilitation

11

worker to whom the report was addressed (Mr. Adcock). This mistake of fact undermines the ALJ's subsequent analysis of the report, which the ALJ discounted because Mr. Adcock did not personally examine Lisa W. Thus, the ALJ's decision fails to build a logical bridge, and the misattribution resulted in a credibility finding that was patently wrong.

The Court finds the RFC analysis troublesome for the additional reason that, although the record is replete with complaints about Lisa W.'s migraine headaches, the ALJ's decision does not describe, analyze, or summarize the medical evidence or symptoms on this front at all. *See Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) ("[A]lthough the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected.") (quoting *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). The Court is unable discern from the ALJ's decision whether the ALJ considered the evidence regarding Lisa W.'s migraine headaches or the reasons for not including limitations of absence and time off task posed by the headaches.

The ALJ relies on Dr. Fischer, but the ALJ had an obligation to confront the ways in which Dr. Fischer's opinion (that the migraine headaches were not severe and posed no limitations) conflicted with other evidence in the record, including absenteeism attributable to headaches, Lisa W.'s testimony, and Dr. George's opinions regarding Lisa W.'s ability to work when experiencing a migraine headache. Perhaps most troubling is the ALJ's statement, seemingly offered as the reason for giving short shrift to the extensive evidence regarding migraines, that "[t]he claimant has not alleged, and the record does not support, that migraines … has caused more than minimal work-related difficulties." [Filing No. 12-2 at 24.] This statement is simply incorrect; Plaintiff has been clearly alleging, throughout the DIB proceedings, that she cannot work because of

migraines and presented lengthy medical records addressing her migraine headaches and the treatments that she has received to alleviate them.

Thus, the Court finds that the ALJ failed to build a logical bridge between the evidence and the RFC finding and that the misattribution of Dr. George's report resulted in a patently wrong credibility finding underlying the RFC.  The Court will **REMAND** this case so that the ALJ can fully consider the evidence of limitations posed by Lisa W.'s migraine headaches and so that the ALJ can fully articulate findings regarding the same.

### B.  Other Issues

The Court need not resolve other issues raised by Lisa W. because the problems surrounding the ALJ's assessment of Lisa W.'s migraine headaches is dispositive.  Nevertheless, on remand, the ALJ should take care to fulfill her obligation to build a logical bridge from the evidence to the conclusion and consider all applicable listings.

### IV. CONCLUSION

For the reasons detailed above, the Court **REVERSES** the ALJ's decision denying Lisa W. benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence 4) as detailed above.  Final judgment will issue by separate entry.

Date: 3/22/2022

                                                  Mario Garcia
                                                  United States Magistrate Judge
                                                  Southern District of Indiana

**Distribution via ECF to all counsel of record.**